

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-15-1999

# United States v Yeaman

Precedential or Non-Precedential:

Docket 98-1102

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"United States v Yeaman" (1999). *1999 Decisions.* Paper 284.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/284

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 15, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 98-1102 and 98-1146

UNITED STATES OF AMERICA
Appellant in No. 98-1146

v.

DAVID REX YEAMAN
Appellant in No. 98-1102

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Crim. Action No. 96-cr-00051-3)
District Judge: Honorable Clarence C. Newcomer

Argued July 30, 1999

BEFORE: SLOVITER, NYGAARD and STAPLETON,
Circuit Judges

(Opinion Filed: October 15, 1999)

        Frank C. Razzano (Argued)
        Eric A. Bensky
        Dickstein, Shapiro, Morin
         & Oshinsky
        2101 L Street, N.W.
        Washington, D.C. 20037
         Attorneys for David Yeaman
         Appellant in No. 98-1102

Michael R. Stiles
U.S. Attorney
Walter S. Batty, Jr.
Assistant U.S. Attorney
Robert E. Courtney, III
Deputy U.S. Attorney
Andrea G. Foulkes (Argued)
Assistant U.S. Attorney
Thomas V. Sjoblom
Special Assistant U.S. Attorney
Office of U.S. Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
 Attorneys for United States
 of America
 Appellant in No. 98-1146

Paul A. Tufano, General Counsel
Commonwealth of Pennsylvania
330 Market Street
Harrisburg, PA 17120
 and
Alan C. Kessler
Andrew W. Allison (Argued)
Buchanan Ingersoll
Eleven Penn Center, 14th Floor
1835 Market Street
Philadelphia, PA 19103
 Attorneys for Amicus
M. Diane Koken
Insurance Commissioner of the
Commonwealth of Pennsylvania

OPINION OF THE COURT

STAPLETON, Circuit Judge:

David Rex Yeaman, along with four other defendants, was convicted of various counts of conspiracy, wire fraud, and securities fraud. His conviction resulted from his involvement in a complex scheme involving the leasing of worthless stocks of three public companies, U.S. Card

2

Investors, Inc. ("U.S. Card"), Omega Power ("Omega"), and American Family Services ("AFS"), to the Teale Network ("Teale"), a fraudulent network of offshore and domestic companies.1 Teale represented these leased stocks as assets available to pay claims pursuant to reinsurance contracts entered into with a Pennsylvania-based insurance company, World Life and Health Insurance Co. ("World Life"). When these assets were called upon to pay outstanding medical reinsurance claims, the stocks were deemed worthless.

Yeaman has appealed from the jury's verdict and a sentencing adjustment. The government has cross-appealed the sentence imposed by the District Court.

I.

World Life became insolvent at some point in or before 1988. It hid its insolvency from regulators and its insureds, however, by placing a piece of land valued at $60,000 on its books as worth several million dollars. World Life issued the four group medical policies involved in this case in late 1989, in the spring of 1990, in the summer of 1990, and on December 1, 1990. Teale's contracts reinsuring these policies were entered on November 16, 1989, May 30, 1990, June 28, 1990, November 10, 1990, and November 11, 1990. Pursuant to these agreements, Teale assumed 100% of the liability under the four group medical insurance policies issued by World Life in exchange for 92% of the premiums paid by World Life's insureds on those policies. These reinsurance transactions allowed World Life to reflect a reserve credit of approximately $6 million. Teale received total premiums from World Life of approximately $7 million under its reinsurance contracts. The indictment alleged that the conspiracy among Teale and the defendants existed from about May of 1990 to June of 1992.

In 1990, Philip Rennert created Forum Rothmore, which acted as an intermediary between Teale and publicly traded

_____

1. The Teale Network was organized and controlled by Alan Teale. Neither is a party to these proceedings but both are alleged to be unindicted co-conspirators. We will refer to both collectively as "Teale."

corporations that desired to lease their stock. Forum Rothmore entered into "surplus contribution agreements," known as RENN contracts, with Teale. The first RENN contract involving one of the defendants was executed on September 1, 1990. Yeaman was involved in a series of RENN contracts entered between December 1, 1990, and April 1, 1991.

Under the terms of these contracts, corporations leased their stock to Teale and authorized the sale of the stock if necessary to pay claims under insurance policies that Teale had reinsured. The value of the stock leased was calculated by multiplying the number of shares by the market price. Teale then listed these shares at the same value on the financial statements presented to World Life. In exchange, Teale paid a percentage of the monthly leasing fees it received from World Life to Forum Rothmore, which in turn split the fees with the stock providers. Of the approximately $7 million Teale received, about $3.3 million was distributed to the defendants as rental fees for the leased securities.

Yeaman was president of Capital General Corporation ("Capital General"). Capital General assisted other companies in going public through mergers with existing shell corporations that had previously completed their SEC registration. After the merger, Capital General retained some interest in the corporations, and Yeaman handled the registration and promotion of the stock. National Stock Transfer ("NST"), a subsidiary of Capital General, was the transfer agent and performed the record keeping functions for the public corporations with whom Capital General dealt.

U.S. Card, Omega, and AFS were formed via mergers orchestrated by Yeaman and Capital General. U.S. Card was a small baseball card business operated in the home of the father of one of Yeaman's associates in Hull, Massachusetts. Its total inventory was less than $50,000. Omega was a nearly insolvent business that bought and sold surplus high voltage power line equipment. Omega had minimal operations conducted by a sole proprietor who was desperately seeking capital for his business. AFS also had

4

no significant assets or profit making activity. Yeaman was an officer and director of these three corporations.

In spite of the minimal value of these corporations, Yeaman purported to lease $8 million of U.S. Card stock, $2 million of Omega stock, and $2 million of AFS stock to Teale. In order to be able to attribute such high values to these stocks, Yeaman manipulated the market quotes and inflated the financial statements of these corporations. Moreover, while certain of these stocks were restricted, they were represented to be marketable and were transferred without any indication of their restricted status. Forum Rothmore assisted Yeaman in leasing these falsely-valued and restricted stocks. In short, securities were falsely held out by the defendants and Teale to be marketable and valuable, when, in fact, they were not marketable and were virtually without value.

In January 1991, the Pennsylvania Insurance Department began to investigate World Life's financial condition. On July 28, 1991, the Pennsylvania Insurance Commissioner declared World Life insolvent and ordered its liquidation. Since Teale had been paying insurance claims with recently received premiums and had no other significant assets to draw upon, this liquidation deprived Teale of the ability to pay further claims.

The Pennsylvania Life and Health Insurance Guarantee Fund is a state fund authorized by statute to pay outstanding liabilities of licensed Pennsylvania companies that become insolvent. The Guarantee Fund is financed by Pennsylvania insurance companies. When World Life was liquidated, the Guarantee Fund paid the outstanding group medical reinsurance claims left unpaid as a result of the fraud. The unpaid claims totaled over $6 million.

In February 1996, Yeaman was indicted in the Eastern District of Pennsylvania and charged with one count of conspiracy and multiple counts of wire and securities fraud. The conspiracy charge included an allegation that Yeaman failed to disclose in SEC and NASD filings that he "previously had been found to have violated the securities laws." (A.116, Count 1 P 6(o)(2)). This allegation was incorporated into the wire and securities fraud counts.

5

Yeaman moved to strike this language from the indictment on the ground that he had no duty to disclose former securities law violations and/or that he did disclose the information required by law.

The District Court denied Yeaman's motion because it determined that if certain predicate facts could be established, Yeaman had a duty to disclose five securities-related administrative proceedings. The government later introduced two of these proceedings into evidence. One proceeding was a 1988 SEC administrative action against NST that resulted in a censure order. See In the Matter of National Stock Transfer, Inc., 41 S.E.C. Docket 1219 (1988). The other proceeding was an SEC investigation that began in 1987 and culminated in a cease and desist order entered against Yeaman and Capital General in 1993. See In the Matter of Capital General Corp., 54 S.E.C. Docket 1322 (1993). A third proceeding, in which the Oregon Department of Insurance and Finance entered a cease and desist order against Yeaman and Capital General, was admitted by stipulation of the parties. See In the Matter of Capital General Corp. and David Yeaman, E7-49 (Oregon Dept. of Ins. & Finance, April 28, 1988).

After a four week trial, the jury, by general verdict, convicted Yeaman of the one count of conspiracy, five counts of wire fraud, and three counts of securities fraud. At the sentencing hearing, the District Court assigned Yeaman an offense level of 11, which included a one-point upward departure for causing a loss of confidence in an important institution. The District Court found no monetary loss attributable to Yeaman and refused to impose adjustments for jeopardizing the safety of a financial institution and use of special skills. The District Court sentenced Yeaman to 14 months imprisonment and a $20,000 fine.

II.

Yeaman first contends that his conviction must be reversed because the jury's general verdict may have been based on an improper legal theory. Yeaman argues that the District Court erred in concluding that he had a duty to

disclose the 1988 SEC censure order entered against NST and the SEC's investigation that began in 1987 and led to a 1993 cease and desist order entered against Capital General and Yeaman. The admission at trial of evidence of these proceedings allowed the jury to consider Yeaman's nondisclosure of them in determining whether he was guilty of conspiring, wire fraud, and securities fraud. Yeaman seeks reversal and a new trial in which such evidence would be excluded. The District Court's legal conclusions with respect to these two proceedings are subject to plenary review.

## A. 1988 SEC Administrative Proceeding against NST

Regulation S-K, 17 C.F.R. S 229.401, mandates that certain information pertaining to corporate management and control persons be included in the periodic reports that public companies file with the SEC. Item 401(f) of that regulation requires disclosure of certain legal proceedings that occurred in the past five years and that are"material to an evaluation of the ability or integrity of any director, person nominated to become a director or executive officer of the registrant." Item 401(f)'s six subparagraphs list the types of legal proceedings that must be disclosed. Items 401(f)(3) and (4) require disclosure when "[s]uch person was the subject of any order, judgment, or decree, not subsequently reversed, suspended, or vacated" of a court of competent jurisdiction or federal or state authority, and the order, judgment, or decree was related to certain specified behaviors. 17 C.F.R. S 299.401(f)(3)-(4) (emphasis added).

Since Yeaman was an officer and director of U.S. Card and Omega, the government alleged that Item 401(f) of Regulation S-K required the 1989 and 1990 Form 10-K reports of these companies to disclose the 1988 SEC order entered against NST.2 The 1988 order found that NST had violated various securities laws on a number of occasions,3

_____

2. Because AFS was a non-registrant and non-reporting company under the federal securities laws, Regulation S-K does not apply to it. (A.159 n.16)
3. In the course of the administrative proceeding against NST, the Commission found that NST willfully violated Sections 17(a)(3), 17(f)(1), (2), and (3), 17A(c), 17A(d) and Rules 17f-1, 17f-2, 17Ac2-1, 17Ac2-2, 17Ad-6, 17Ad-10, 17Ad-11, 17Ad-13 thereunder. (A.235-36)

censured NST, directed it to take corrective measures, ordered it to retain an independent outside accountant to report on the implementation of those measures, and required NST's president to execute an affidavit verifying that the services of an independent accountant had been engaged. Yeaman was not a named party to the proceeding.

Before the District Court, Yeaman contended that Items 401(f)(3) and (4) only refer to persons who were "named" in the proceedings and thus that he had no duty to disclose the 1988 proceeding against NST. Concluding that this argument had no merit, the District Court contrasted the text of Items 401(f)(3) and (4) with that of Item 401(f)(2) in the same regulation. Item 401(f)(2) requires disclosure if the director or control person "was convicted in a criminal proceeding or is a named subject of a pending criminal proceeding." See 17 C.F.R. S 299.401(f)(2) (emphasis added). The District Court observed: "Although Item 401(f)(2) refers to `named subject,' Item 401(f)(3) and (4) merely refer to `the subject of,' which connotes a broader meaning than `named subject.' Surely, if (f)(3) and (f)(4) meant only `named subject,' the SEC could have explicitly stated so, as it did in (f)(2)." (A.150)

The District Court went on to note that the government had alleged that it possessed evidence demonstrating that: (1) Yeaman was the director and president of Capital General; (2) Yeaman owned more than 90% of Capital General's stock; (3) Yeaman owned and controlled NST through Capital General; (4) Yeaman was president of NST in 1988 and already was or became its director; and (5) NST and Capital General were affiliates as defined in Rule 405 of the Securities Act, 17 C.F.R. S 230.405. (A.150–51) The Court held that if the government could prove these allegations at trial, "then there would be no question that Yeaman was the `subject of' [the 1988 order entered against NST]." (A.151)

On appeal, Yeaman continues to assert that he was not "the subject of" the 1988 proceeding within the meaning of 17 C.F.R. S 229.401(f)(3) and (4) because he was not a named party to that proceeding. In support of this argument, he cites to the Uniform and Integrated Reporting Requirements: Directors and Executive Officers, Securities

8

Act Release No. 33-5949, 1978 SEC LEXIS 1031, at *24 (July 28, 1978), which states:

> Item 3 [now known as Item 401, or 17 C.F.R. S 229.401] makes it clear that disclosure of criminal convictions, criminal proceedings, orders, judgments, etc. is required only where the executive officer, director, or nominee for election as a director is a named party in the legal proceeding.

Yeaman avers that the word "criminal" in this SEC release does not modify the terms "orders" or "judgments," and that the "named party" limitation therefore applies equally to civil orders and judgments. He concludes that we should defer to this interpretation of S 229.401(f)(3) and (4) by the Commission.

In order to understand what Item 3 "makes clear," we must examine the above-quoted statement in context. Prior to 1978, Regulation S-K contained only Items 1 and 2. In 1976, the Commission proposed several amendments to Regulation S-K, including a new section requiring disclosures concerning directors and officers. Section (f) of this amendment as originally proposed is substantially similar to the current version of Item 401(f), except that Section (f)(2) required disclosure if "[s]uch person was convicted in a criminal proceeding . . . or is the subject of a criminal proceeding which is presently pending." Disclosure of Management Background: Uniform Reporting Requirements, Exchange Act Release No. 34-12946, 10 S.E.C. Docket 834, 1976 WL 15989, at *10 (Nov. 2, 1976) (emphasis added). In response to comments received on this proposed amendment, Item 3(f)(2), as it was known upon its adoption in 1978, was amended to read: "[s]uch person was convicted in a criminal proceeding or is a named subject of a pending criminal proceeding." Securities Act Release No. 33-5949, 1978 SEC LEXIS 1031, at *40 (emphasis added). The SEC's statement in the release cited by Yeaman is thus explaining a change in the originally proposed section dealing solely with criminal proceedings. It is accordingly clear that the word "criminal" was intended to modify "orders, judgments, etc." as well as "convictions" and "proceedings." We find it equally clear that the District Court properly regarded the difference between "named

9

subject" in Item 401(f)(2) and "subject" in Item 401(f)(3) and (4) as deliberate and significant and properly concluded that the latter term is a broader concept. We thus reject Yeaman's reading of Item 401(f)(3) and (4).

B. SEC Investigation of Capital General and Ye aman between 1987–1990

The anti-fraud provisions of the securities laws impose a duty to disclose material facts that are necessary to make disclosed statements, whether or not mandatory, not misleading. See 15 U.S.C. SS 77q(a), 77x. The District Court held that Yeaman violated this duty by failing to disclose, in the Form 10-K reports filed by Omega and U.S. Card in March 1990, that he and Capital General had been the subject of an SEC investigation since 1987.[4]

The 10-K reports of these companies made no reference to this investigation and affirmatively asserted the following:

> Other than described above, neither the Registrant nor any of its officers or directors, to their best knowledge, is a party to any material legal proceeding or litigation which would impact the operations or the Registrant, and such persons know of no material legal proceedings, judgments entered, legal actions or litigation contemplated, or threatened which would impair operation of the Registrant in the future.

(A.152 (quoting 10-K reports)). The Court found that disclosure of the investigation was necessary in order to make not misleading the disavowal of knowledge of threatened proceedings that would impair the operations of the corporation. As a result of its holding, the Court allowed evidence of the investigation to be admitted at trial. While the Court's opinion stated that it found the relevant statements to be material and misleading, and thus

_____

4. In 1993, after a five year investigation, the SEC ordered Yeaman and Capital General to cease and desist from committing or causing further violations of Sections 5(a) and (c) and 17(a) of the Securities Act, and Sections 10(b) and 13(g) of the Securities Exchange Act, and Rules 10b-5, 12b-20, and 13d-1(c) promulgated thereunder. See In the Matter of Capital General Corp., 54 S.E.C. Docket 1322 (1993).

10

violative of the securities laws, the jury instructions indicate that the jury was properly charged to make its own determinations in these respects.

On appeal, Yeaman insists that he did not know at the time of filing the 10-K reports that the SEC planned to commence litigation. He notes that the administrative proceeding that resulted from this investigation was not instituted until June 22, 1992, and did not result in a cease and desist order until July 23, 1993. He insists that, while he knew of the investigation at the time offiling the March 1990 reports, he did not know that the investigation was focused on or might impact U.S. Card or Omega. As a result, he disagrees that a duty to disclose the investigation existed or that the affirmative statements contained in the 10-K reports were misleading in any respect. In response, the government points out, inter alia, that the investigation had been ongoing since 1987, that it instituted suit against Yeaman and Capital General in June of 1990 to enforce a subpoena duces tecum theretofore issued to them, and that the Court ordered compliance in July of 1990. Taken as a whole, the government argues, the evidence compelled the conclusion that Yeaman must have been aware of the scope and gravity of the investigation prior to March of 1990 and, given his knowledge of his own activities prior to March 1990, he must have known of the probability of a proceeding that would implicate U.S. Card or Omega.

We conclude that the government's evidence regarding the investigation was properly submitted to the jury for consideration as to whether the 10-K reports were materially misleading in light of the affirmative statement quoted above. While Yeaman argues that the District Court committed a legal error, his claim properly characterized is that the evidence was insufficient to support a conviction on the theory that the reports were materially misleading. When reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the government and ask whether a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998) (internal citations omitted). Under this standard, we believe the government has tendered sufficient evidence to support

11

this theory. We need not base our rejection of Yeaman's argument on this ground, however.

We have concluded that 15 U.S.C. SS 77q(a) and 77x provide a solid legal foundation for the government's theory of liability based on failure to disclose the SEC investigation. Assuming that there were insufficient evidence to support this theory, Yeaman nevertheless would not be entitled to a new trial because the government advanced other alternative, legally valid theories at trial that were supported by sufficient evidence. Under the teachings of Griffin v. United States, 502 U.S. 46 (1991), we are required in such circumstances to presume that the jury found the defendant guilty beyond a reasonable doubt on a theory supported by the evidence.

III.

Yeaman also requests reversal based on two challenges to the jury instructions. Review of the legal standard enunciated in a jury instruction is plenary, see United States v. Johnstone, 107 F.3d 200, 204 (3d Cir. 1997), but review of the wording of the instruction, i.e. , the expression, is for abuse of discretion. See United States v. Zehrbach, 47 F.3d 1252, 1264 (3d Cir. 1995) (en banc). This Court reviews jury instructions to determine whether,"taken as a whole, they properly apprized the jury of the issues and the applicable law." Dressler v. Busch Entertainment Corp., 143 F.3d 778, 780 (3d Cir. 1998) (internal quotation omitted).

A. Unanimity Instruction

Section 17(a) of the 1933 Act, 15 U.S.C. S 77q(a), makes it unlawful for any person "in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly," to do any of the following:

> (1) to employ any device, scheme, or artifice to defraud, or

> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the

12

statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. S 77q(a). The indictment alleged in the conjunctive that Yeaman engaged in conduct that came within all three of these subsections. At the conclusion of trial, the District Court declined to give the following instruction that Yeaman insisted should follow immediately after the Court read subsections (1)–(3) of Section 17(a):

It is not necessary for the government to establish all three types of unlawful conduct in connection with the offer or sale of securities; any one will be sufficient for a conviction if you so find. However, you must unanimously agree upon which of the types of unlawful conduct the defendant engaged in. If you cannot agree on any one or more of the means, you must find the defendant not guilty.

The District Court instead charged as follows:

The second element that the government must prove beyond a reasonable doubt is that in the offer or sale of the particular security the defendants did any one or more of the following:

(1) employed a device, scheme, or artifice to de fraud, or

(2) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading, or

(3) engaged in an act, practice, or course of busi ness that operated, or would operate, as a fraud or deceit upon a purchaser, seller, or other person.

It is not necessary for the government to establish all three types of unlawful conduct in connection with the offer, sale, or purchase of the particular security. Any one type of unlawful conduct will be sufficient for a conviction, if you so find such unlawful conduct.

13

Yeaman suggests that this instruction constitutes reversible error.5

It is well settled that a defendant in a federal criminal trial has a constitutional right to a unanimous verdict. See United States v. Edmonds, 80 F.3d 810, 814 (3d Cir. 1996). This includes the right to have the jury instructed that in order to convict, it must reach unanimous agreement on each element of the offense charged. It is equally well settled, however, that this does not mean one has a right to insist on an instruction requiring unanimous agreement on the means by which each element is satisfied. When a statute enumerates alternative routes for its violation, it may be less clear, however, whether these are mere means of committing a single offense (for which unanimity is not required) or whether these are independent elements of the crime (for which unanimity is required). In making this determination, Edmonds teaches that two questions must be addressed:

> First, did the legislature intend the different routes to establish separate "offenses," for which unanimity is required as to every fact constituting the offense, or different "means" of violating a single offense, for which unanimity is not required? Second, if the legislature intended the alternative routes to be mere means of violating a single statute, is the statute's definition of the crime unconstitutional under the Due Process clause?

Edmonds, 80 F.3d at 815.

We begin our analysis by noting that Section 17(a)first focuses on an historic event -- the offer or sale of a security utilizing an instrument of interstate commerce. It then requires that the defendants' conduct with respect to that offer or sale fall within one or more of three closely related

_____

5. Although the government contends that this issue was waived, we note that defense counsel submitted the above-quoted proposed jury instruction indicating the need for unanimous agreement as to which subsection of Section 17(a) was violated and objected, both at the instruction hearing and at the conclusion of trial, to the District Court's
instructions to the extent that they deviated from their proposed instructions.

14

categories -- a "device, scheme or artifice to defraud," an obtaining of money or property by material misrepresentation, or a transaction that operates as a fraud or deceit on a purchaser. While each category has its own parameters, see United States v. Naftalin, 441 U.S. 768 (1979), they are largely overlapping categories and all fall within the traditional understanding of the concept of fraud. Most conduct that falls within one is likely to satisfy another as well.

These characteristics of the relevant statute and the nature of the specific unanimity charge requested here distinguish this case from the situation involved in Edmonds and Richardson v. United States, 119 S. Ct. 1707 (1999). The statute involved in those cases, the Continuing Criminal Enterprise Statute ("CCE"), requires that the defendant have engaged in a "continuing series of violations" of a broad range of specified criminal statutes. The indictments there charged numerous such violations and the defendants asked that the jury be instructed that it must unanimously agree on each violation it relied upon as satisfying the requirement of a "continuing series of violations." In both cases, the Courts declined to find that Congress intended "CCE predicate offenses to constitute mere means of [committing] a single CCE offense" and suggested that such a finding would raise serious questions under the Due Process Clause. Edmonds, 80 F.3d at 819. Both courts stressed that the "statute's word `violations' covers many different kinds of behaviors of varying degrees of seriousness" and that failing to treat each violation as a separate element would create substantial risk that a guilty verdict might mask "wide disagreement among the jurors about what the defendant did, or did not, do." Richardson, 119 S. Ct. at 1711.

Section 17(a) does not cover "many different kinds of behavior of varying degree of seriousness" and the requested charge was not directed at the same concern identified in Edmonds and Richardson. The statute is limited to fraud in connection with an offer and sale of securities in interstate commerce. The requested charge did not seek to require jury unanimity with respect to whether Yeaman engaged in the alleged market manipulation, the

15

alleged representation of restricted securities as unrestricted, or the alleged failure to disclose material SEC proceedings. Thus its function would not have been to increase the assurance that Yeaman committed specific criminal conduct. Its only function would have been to require jury unanimity on whether Yeaman's conduct constituted a scheme to defraud, an obtaining of money by material misrepresentation, or a transaction that operated as a fraud on a purchaser, as those concepts are used in Section 17(a).

We are confident that the District Court's denial of the requested instruction did not in any way frustrate Congress's intent in passing Section 17(a) or jeopardize any fairness concept embodied in the Due Process Clause. 6 Indeed, we perceive no purpose that would have been served by putting the jurors to the task Yeaman's charge would impose on them -- a task that would require them not only to determine what Yeaman did but also to agree upon the outer limits of each of the subsections of Section 17(a) in this factual context.

We find the most helpful precedent to be the decision of the Court of Appeals for the Ninth Circuit in United States v. UCO Oil Co., 546 F.2d 833 (9th Cir. 1976). The statute there, 18 U.S.C. S 1001, provided:

> "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or make or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

_____

6. In order to comport with due process, we have indicated that different means for committing an offense "must reflect notions of `equivalent blameworthiness or culpability.' " Edmonds, 80 F.3d at 820 (quoting Schad, 501 U.S. at 643). In light of the similarity of these three alternatives and the fact that each alternative has the same mental state requirement, we conclude that this requirement is met.

16

546 F.2d at 836. Each relevant count of the indictment was based on an identified document and charged the defendants both with having "made . . . false writings . . . knowing the same to contain false . . . statements" and with having "falsified, concealed and covered up by trick, scheme and device material facts." The Court concluded that Section 1001 specified alternative means for committing a single offense and that, as a result, it was not necessary for "the jury, in arriving at a unanimous verdict, [to] agree on the particular means by which the offense was committed." The Court explained:

> On the face of it, the statute, framed in a single paragraph and providing a single penalty, does not suggest Congressional purpose to create more than one offense. Moreover, the statute is directed at a single evil, i.e., the "perversion" of "the authorized functions of governmental departments and agencies . . . which might result from the deceptive practices described." United States v. Gilliland, 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1941). The types of conduct enumerated all fall within the general understanding of what constitutes fraud. As the court put it in Charles Hughes & Co. v. Securities and Exchange Comm'n, 139 F.2d 434, 437 (2d Cir. 1943):

> "The law of fraud knows no difference between express representation on the one hand and implied misrepresentation or concealment on the other."

> See also, Gusow v. United States, 347 F.2d 755, 756 (10th Cir. 1965).

> It is reasonable to conclude, therefore, that Congress was concerned with proscribing the prohibited result rather than particular kinds of conduct. That being so, consistency calls for interpreting the enumeration of different kinds of conduct in the statute as reflecting different modes of achieving that result, not separate and distinct offenses. . . .

546 F.2d at 836. We find this reasoning equally cogent here.

B. Restricted Stock Instruction

Yeaman also argues that the District Court improperly instructed the jury that it could find a Securities Act

17

violation based solely on his having held and transferred restricted stock. According to Yeaman, the charge relieved the government of its burden of proving that Yeaman engaged in fraud by misrepresenting the restricted stock as free-trading stock.

After instructing the jury on the elements of Section 17(a), the judge noted that "the government contends that certain of the defendants engaged in the fraudulent sale of restricted stock." (A.4159) The judge informed the jury that restricted stock is stock acquired directly or indirectly from an issuer in a transaction not involving any public offering; and that such stock is deemed "restricted" because there are restrictions on its resale to the public. See 17 C.F.R. S 230.144. The judge then gave the instruction we have set forth in the margin.[7]

_____

7. Now, the Government contends that the defendants made use of certain restricted securities in furtherance of some fraudulent acts and practices by distributing and contributing those stocks to the off-shore reinsurance companies. I have already defined for you what a restricted stock is and the requirements under the law if and when the restricted stock is going to be sold. If you find that the defendants held restricted stock, then you may find the defendants engaged in acts, practices and courses of business that operated as a fraud and deceit. And that they made material misrepresentations by manipulating the price of the stocks by contributing them to the off-shore reinsurers who placed them on their financial statements to give the appearance of highly valued assets, by participating in the misrepresentations made by their co-conspirators who used those financial statements to misrepresent the financial well being of the off-shore reinsurers when contracting with a primary insurance company in Pennsylvania. And by misrepresenting that these stocks could be liquidated to meet claims when they could not.

Now, the Government also contends that the defendants made use of certain restricted securities in furtherance of the fraudulent acts and practices by distributing and pledging these restricted stocks to the banks which held and maintained the escrow accounts. If you find that the defendants held restricted stock, then you mayfind that the defendants engaged in acts, practices and courses of business that operated as a fraud and deceit and made material misrepresentations in connection with the deposit of those stocks into the escrow accounts, if you find one or more of the following.

18

We do not find this jury instruction to be legally inaccurate or improper in any respect. The purpose of the Court's instruction was to provide examples of the way that the defendants may have violated Section 17(a), assuming that the defendants used restricted stock in the course of their dealings. To find defendants guilty under one of these possible scenarios, the jury first had to find that defendants held restricted stock. The implication of the Court's statement "[i]f you find that the defendants held restricted stock," is that if the jury did not so find, then their consideration of this theory was precluded. If the jury did find that the defendant held restricted stock, then the jury was obliged to consider whether the evidence supported a finding that the defendants engaged in transactions with these stocks that would operate as a fraud or deceit. Thus, we find no error in the Court's restricted stock instruction.

IV.

In combination, the parties raise four sentencing issues. The government finds three flaws in the District Court's application of the Sentencing Guidelines: (1) the finding of no loss under U.S.S.G. S 2F1.1; (2) the failure to impose a

_____

First, if you find that the defendants contributed through Forum Rothmore and World Re and into the escrow accounts stock positions they controlled in one or more of the five companies. And at the time they did so, they had not held the Rule 144 stock long enough to meet the two or three year holding I described previously. Or secondly, Forum Rothmore became an underwriter and was thus engaged in an unlawful distribution. An underwriter is defined by statute to mean any person who either has purchased from an issuer, with a view to or offers or sells for an issuer in connection with the distribution of any security. Or any person who participates or has a direct or indirect participation in any such undertaking. Or third, they engaged in acts, practices or courses of business that operated as a fraud on the escrow accounts when they engaged in an unlawful distribution and had violated the rules concerning the sale of restricted stock.

It's not necessary you find the defendants engaged in all three of these courses of business or conduct. Anyone (sic) is sufficient.

(A-4164-4166).

19

four-level increase under U.S.S.G. S 2F1.1(b)(6) for a substantial effect on a financial institution; and (3) the rejection of a special skills enhancement under U.S.S.G. S 3B1.3. Yeaman challenges the District Court's upward departure based on its finding that Yeaman's fraudulent acts resulted in loss of confidence in an important institution.

The standard of review of a district court's interpretation and application of the Sentencing Guidelines is plenary. See United States v. Hallman, 23 F.3d 821, 823 (3d Cir. 1994). Findings of facts are measured by the clearly erroneous test. See United States v. Hillstrom, 988 F.2d 448, 450 (3d Cir. 1993). This Court's review of a district court's decision to depart upward is plenary as to whether the increase was permissible. We review the reasonableness of the degree of the departure for an abuse of discretion. See United States v. Kikumura, 918 F.2d 1084, 1098, 1110 (3d Cir. 1990).

A. Calculation of Fraud Loss under U.S.S.G.S 2F1.1

Section 2F1.1(a) of the Sentencing Guidelines establishes a base offense level of six for offenses involving fraud and deceit. See U.S.S.G. S 2F1.1.8 Pursuant to Section 2F.1.1(b), the base offense level must be increased according to the size of the loss. This Court's precedents establish that " `fraud loss is, in the first instance, the amount of money the victim has actually lost,' " United States v. Coyle, 63 F.3d 1239, 1250-51 (3d Cir. 1995) (quoting United States v. Kopp, 951 F.2d 521, 523, 536 (3d Cir. 1991)). However, "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than actual loss." Application Note 7 to U.S.S.G. S 2F1.1. While the greater of actual loss and intended loss is the preferred measure, there are situations in which the defendant's gain can appropriately be used as a measurement of loss. A court may look to a defendant's gain as an alternative measure but only "[w]hen if it is not feasible to estimate with reasonable accuracy the victim's loss [or intended loss] and where there is some logical relationship between the victim's loss and the defendant's

_____

8. All references to the Sentencing Guidelines are to the 1997 version.

20

gain so that the latter can reasonably serve as a surrogate for the former." United States v. Dickler, 64 F.3d 818, 826 (3d Cir. 1995) (indicating, by way of example, that proceeds from resale of object taken could provide estimate of loss because sale would establish approximate market value of object). Additionally, "the loss need not be determined with precision. The Court need only make a reasonable estimate of the loss given the available information." Application Note 8 to U.S.S.G. S 2F1.1.

The relevant conduct provision of the Sentencing Guidelines, S 1B1.3, provides that specific offense characteristics, -- in this instance the loss amount that should be attributed to the defendant under S 2F1.1, -- are to be determined on the basis of the following:

> (1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> * * *
>
> (3) all harm that resulted from the acts and omissions specified in [the above ] subsections. . . , and all harm that was the object of such acts and omissions.

U.S.S.G. S 1B1.3. In the context of a jointly undertaken criminal activity, Application Note 2 indicates that the conduct attributable to a defendant does not include the conduct of other participants prior to defendant's joining the activity, even if the defendant knows of that conduct. See Application Note 2 to U.S.S.G. S 1B1.3. On the other hand, one who commits to a scheme to defraud already in progress is responsible from that point on for all reasonably

21

foreseeable loss occasioned by other participants acting in furtherance of the scheme.

We have previously held that Section 1B1.3(a)(3) establishes a causation requirement when determining actual loss. See United States v. Neadle, 72 F.3d 1104, 1114–15 (3d Cir. 1996) (Becker, J., concurring in part and dissenting in part) ("[T]he plain meaning of`resulted from' connotes causation."), opinion amended by 79 F.3d 14 (3d Cir. 1996); United States v. Evans, 155 F.3d 245, 253 (3d Cir. 1998) ("[T]he actual loss determination must be predicated on the harm caused by [defendant's] offenses.").

Where the defendant takes something without giving anything to the victim in return, the value of the thing taken reflects the victim's loss. However, where the defendant gave something of value in exchange for what was fraudulently taken, the victim's loss is the difference between the value of what he or she gave up and the value received in exchange. See United States v. Dickler, 64 F.3d 818, 825 (3d Cir. 1995).

In the Pre-Sentence Investigation Report, the Probation Office recommended a loss calculation of $6.4 million and the addition of 14 levels pursuant to Section 2F1.1(b)(1). The $6.4 million amount reflects the unpaid medical reinsurance payments owed by Teale to World Life pursuant to the terms of the reinsurance contracts and ultimately paid by the Guarantee Fund. Nonetheless, in sentencing the defendants, the District Court determined that the offense involved no loss. The government contends that the Court erred in several ways: (1) by determining that the offense involved no actual loss; (2) by failing to consider the loss that Yeaman and his business associates intended to impose; and (3) by failing to account for the fact that Yeaman and his co-defendants collectively reaped $3.3 million as a result of the offense.

In determining that no actual loss occurred, the District Court focused on the $6.4 million loss figure contained in the sentencing report. The Court concluded:

> The indisputable fact is that [the] overwhelming majority of harm or loss to the victims occurred prior to any of the defendants joining the conspiracy. Indeed

22

> the evidence shows that the loss that the Government
> is claiming, namely $6.4 million in unpaid claims,[on
> the insurance policies], was incurred as liabilities by
> World Life prior to any conduct by the defendants here.
> In effect, the defendants could not have made the
> liabilities greater. The stock they contributed merely
> failed to cover the liabilities incurred . . . .

(A.658-59). The Court did not explicitly make anyfindings
with respect to intended loss. The District Court also did
not address the gain acquired by Yeaman and the other
participants in the scheme.

The District Court found no actual loss because it
concluded that World Life had issued the policies, and was
thus committed to pay the $6.4 million in claims, prior to
the defendant's misrepresentations. We find the District
Court's analysis flawed for several reasons.

Yeaman and his co-defendants agreed to participate in a
scheme that would enable Teale to collect millions of dollars
in premiums from World Life in exchange for virtually
worthless reinsurance. The victims of the scheme were
World Life and the beneficiaries of the group medical
policies. The record demonstrates that the defendants were
fully aware of the use to be made of their
misrepresentations in the stock leasing agreements and it
strongly suggests that these misrepresentations were
essential to Teale's continued collection of those premiums.
The reinsurance contracts provided for their termination in
the event of the reinsurer's insolvency. Without the assets
of the defendants and the resulting appearance of solvency,
the most reasonable inference is that World Life would have
ceased paying premiums to Teale long before it eventually
did. The District Court failed to make any finding, however,
as to the likelihood of a causal connection between the
misrepresentations of the defendants and Teale's collection
of premiums after the defendants committed themselves to
support the scheme.

If there was a causal connection between the
misrepresentations of Teale, Yeaman, and the other
conspirators and the continued receipt by Teale of
premiums after Yeaman joined the scheme, Yeaman is

23

responsible for an actual loss equal to the premiums received after he joined the scheme less any amount paid by Teale in satisfaction of policy claims out of those premiums or the sale of the reinsurance assets. Yeaman would be responsible in this event for an actual loss whether or not World Life issued its group policies or entered into its reinsurance contract prior to Yeaman's entry on the scene. See United States v. Dickler, 64 F.3d at 825.

Because Teale collected the premiums from World Life as a result of jointly undertaken criminal activity, neither we nor the District Court on remand need determine whether Yeaman in particular caused World Life to cede these amounts to Teale. Under Section 1B1.3(a)(1), Yeaman is accountable, not only for his own acts, but also for the conduct of others that was: (1) in furtherance of the jointly undertaken criminal activity; (2) within the scope of the criminal activity Yeaman agreed to jointly undertake; and (3) reasonably foreseeable in connection with that criminal activity. See U.S.S.G. S 1B1.3(a)(1)(B); Application Note 2; United States v. Evans, 155 F.3d 245, 253-54 (3d Cir. 1998). The record contains ample evidence demonstrating that Yeaman understood the extent of Teale's scheme, including the roles of other parties to the scheme and the need to place a diversity of stocks on Teale's financial record in order to pass muster with World Life and insurance regulators. Accordingly, we have no difficulty concluding that Yeaman is responsible for the acts of all others involved in the scheme that occurred after he entered the conspiracy, and thus all of the premiums ceded by World Life as a result of their combined acts.

The record indicates that Yeaman entered into hisfirst RENN contract on December 1, 1990. On remand, if the District Court finds a causal connection between the conduct of Teale and the other co-conspirators and Teale's continued receipt of premiums, it will determine when before December 1, 1990, Yeaman committed himself to the conspiracy and will calculate the amounts received by Teale in premiums under the reinsurance contracts after that date. It should then reduce that amount by the total claims paid by Teale. If these amounts cannot be calculated with precision, reasonable estimates will suffice.

24

The premiums paid by World Life after Yeaman's decision to enter the scheme may not, however, be the only actual loss measure that this record will support. In United States v. Needle, 72 F.3d 1104 (3d Cir. 1995), we upheld a district court's determination that the actual loss caused by a defendant who issued fraudulent insurance policies was the amount of unpaid claims of policyholders. The record revealed that the defendant misrepresented the amount of his initial capital in order to get into the insurance business and engaged in fraudulent conduct to perpetuate his business. We determined that, but for his fraudulent acts, the defendant would not have been able to enter and remain in the insurance business. We concluded that the insureds' unpaid claims provided a reasonable estimate of the harm resulting from the defendant's fraudulent scheme. See also United States v. Krenning, 93 F.3d 1257, 1270 (5th Cir. 1996)(holding that actual loss caused by defendant who disguised the insolvency of his insurance company and continued to sell policies was losses of policyholders). We see no reason why the Needle analysis should not similarly apply where reinsurance is sold based on a fraudulent inflation of the value of the reinsurer's assets.

In this case, Teale could not have entered and remained in the business of reinsuring World Life but for its fraudulent misrepresentations. Although the District Court made no finding on the issue, the record would also appear to us to support the proposition that World Life was not capable of insuring any of the four group medical policies without having received a commitment for 100% reinsurance. It follows that if the Teale fraudulent reinsurance contracts had not been available, World Life would either have secured other reinsurance or would not have issued the group policies involved. If reinsurance from a solvent reinsurer had been obtained, all claims under the policies would have been paid to the reinsurer; if the group policies had not been issued, the employers who purchased the policies from World Life would have obtained group medical coverage from another source and all claims of the beneficiaries would have been paid in full. In either event, under the teachings of Needle, there would have been a causal nexus between the fraud and all unpaid claims.

25

While it is true, as Yeaman stresses, that he cannot be held responsible for the consequences of Teale's misrepresentations before he joined the conspiracy, he would be responsible for all loss under a group policy reinsured by Teale after he committed to the scheme. The timing of Yeaman's own misrepresentation would be immaterial. While Yeaman's initial RENN contract was entered into on December 1, 1991, a few weeks after the last of the reinsurance contracts, the record suggests that his decision to join the fraudulent scheme may have predated at least some of those reinsurance contracts.

By identifying these ways in which the record suggests that Yeaman may be responsible for an actual loss suffered by World Life and the beneficiaries of its group medical policies, we do not foreclose the District Court from concluding, after an analysis consistent with this opinion, that the government has failed to carry its burden of proving a causal nexus by a preponderance of the evidence. Neither do we intend to indicate that a careful analysis of the voluminous record here could not find support for other theories involving such a nexus. Even if Yeaman joined the scheme after all of the reinsurance contracts had been entered, for example, it does not necessarily follow that he is not responsible for any of the unpaid claims arising under the group policies. Needle emphasizes that an insurer's continued fraud may allow it to remain in business longer than it otherwise would. Here, in the absence of Yeaman's participation in the scheme, Teale's insolvency may have surfaced earlier than it did and less loss may have been occasioned to World Life and the beneficiaries of its group policies than was in fact occasioned by the end of the conspiracy. We do not mean to foreclose the District Court on remand from pursuing this or any other theory of actual loss suggested by the record. We hold only that the District Court's limited factual findings do not support its conclusion that no actual loss was occasioned.

The government also contends that the intended loss in this case exceeds the actual loss and should, therefore, be used in applying U.S.S.G. S 2F1.1. It argues that the intended loss is the face value of the stock provided by

Yeaman and others under the RENN contracts and reported in Teale's financial statements. We do not agree that Yeaman and his co-conspirators intended to cause a loss equal to the amount of the represented value of the leased stocks. Intended loss refers to the defendant's subjective expectation, not to the risk of loss to which he may have exposed his victims. United States v. Kopp, 951 F.2d 521, 529-531 (3d Cir. 1991). Here, Yeaman and the others undoubtedly hoped that their fraudulently inflated securities would never have to be sold and that the scheme would continue for the indefinite future. The loss that they intended was the premiums Teale would receive less any payment of claims necessary to keep the scheme alive. We express no view at this juncture as to whether the current record will support a finding of an intended loss in excess of the actual loss.

Additionally, while we do not foreclose the District Court from considering the gain of Yeaman and the others on remand, their gain would not appear to us to be a helpful alternative in this factual context. That gain would appear to be limited to an amount equal to the minimum actual loss we have held to be appropriate, i.e., to the premiums received by Teale after Yeaman's joinder, less any claims paid in order to maintain the scheme, including any amounts paid by Teale in satisfaction of the outstanding claims upon liquidation.

B. Failure to Apply Four Level Increase Under Section 2F1.1(b)(6)

Section 2F1.1(b)(6) of the United States Sentencing Guidelines provides:

> If the offense--
>
> (A) substantially jeopardized the safety and soundness of a financial institution; or
>
> (B) affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense,
>
> increase by 4 levels. If the resulting offense level is less than level 24, increase to level 24.

27

U.S.S.G. S 2F1.1(b)(6). Application Note 15 states:

> An offense shall be deemed to have "substantially
> jeopardized the safety and soundness of a financial
> institution" if, as a consequence of the offense, the
> institution became insolvent; substantially reduced
> benefits to pensioners or insureds; was unable on
> demand to refund fully any deposit, payment, or
> investment; was so depleted of its assets as to be
> forced to merge with another institution in order to
> continue active operations; or was placed in
> substantial jeopardy of any of the above.

In the course of rejecting an enhancement under Section
2F1.1(b)(6), the District Court explained:

> Based on the evidence the Court finds that the
> defendants did not substantially jeopardize the safety
> or soundness of World Life. As with respect to the loss
> calculation, the Government must demonstrate a
> causal connection between the defendants' conduct
> and the safety and soundness of the institution.
>
> In this case the conduct of the defendants could not
> have caused World Life to become insolvent. World Life
> had been insolvent as a matter of pure accounting long
> before any of the defendants charged conduct. Clearly
> the conduct of the defendants could not have caused
> World Life to become insolvent because it already was.
>
> Finally, the evidence does not establish that
> defendants' conduct caused any of the other
> consequences in application note 15.

(A. 659-60).

While the government concedes that the reinsurers did
not cause World Life's insolvency, they nonetheless contend
that the Court erred in refusing to order an enhancement
under Section 2F1.1(b)(6)(A).9 The government maintains
that the conduct of Yeaman and the other parties to the
scheme substantially reduced benefits to insureds and "left
the company `unable on demand to refund fully any

_____

9. The government has not raised the issue of whether an enhancement
was appropriate under Section 2F1.1(b)(6)(B).

28

deposit, payment, or investment' or meet its obligations to insureds." Government Br. at 117.

Consistent with our previous conclusion that the District Court's factual findings do not support its holding of no actual loss, we conclude that the District Court also erred in holding that Yeaman did not substantially jeopardize the safety and soundness of World Life by (1) substantially reducing benefits to World Life's insureds and (2) placing World Life in a position such that it was unable to refund premiums that were paid in exchange for non-existent coverage. Yeaman and the others received several million dollars of premiums from World Life that should have gone towards paying insureds' claims or refunding their premiums. See United States v. McDermott, 102 F.3d 1379 (5th Cir. 1996) (holding that, even though victim corporation was insolvent independent of fraud,finding of actual loss of $5-10 million caused by defendants' fraud was irreconcilable with finding that defendants did not substantially reduce benefits to insureds or cause corporation to be unable to refund deposit, payments, or investments).

Accordingly, we will remand for application of Section 2F1.1(b)(6)(A).

C. Upward Departure for Loss of Confidence i n Important Institution

Yeaman appeals the District Court's decision to impose a one-level upward departure based on the loss of confidence in an important institution that resulted from his fraudulent acts. Yeaman's challenge is two-fold. He argues that the Court abused its discretion by both (1) concluding that this case fell outside the "heartland" of typical fraud cases; and (2) determining that the record supported the imposed departure.

We begin our analysis by noting that the Commission conceives of each offense guideline as "carving out a `heartland,' a set of typical cases embodying the conduct that each guideline describes." U.S.S.G., Ch. 1, Pt. A intro. p.s. 4(b). In the unusual case where a defendant's conduct falls outside the typical "heartland," the court may consider a departure from the guidelines range. Id. A district court

may impose a sentence outside the guideline range where "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. S 3553(b); see U.S.S.G. S 5K2.0.

As this Court explained in United States v. Iannone, 184 F.3d 214, 226 (3d Cir. 1999):

> The Supreme Court provided additional guidance on departures in Koon v. United States, 518 U.S. 81, 95 (1996), instructing courts to apply the following analysis when considering a S 5K2.0 departure. First, identify the factor or factors that potentially take the case outside the Guidelines' "heartland" and make it special or unusual. Id. at 95. Second, determine whether the Guidelines forbid departures based on the factor, encourage departures based on the factor, or do not mention the factor at all. Id. at 94-95. Third, apply the appropriate rule: (1) if the factor is forbidden, the court cannot use it as a basis for departure; (2) if the factor is encouraged, the court is authorized to depart if the applicable guideline does not already take it into account; (3) if the factor is discouraged, or encouraged but already taken into account by the applicable guideline, the court should depart only if the factor is present to an exceptional degree, or in some other way makes the case different from the ordinary case in which the factor is present; or (4) if the factor is unmentioned, "the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether [the factor] is sufficient to take the case out of the Guideline's heartland." Id. at 95-96 (internal citation and quotation marks omitted).

In the instant case, the District Court concluded that a resulting loss of confidence in an important institution took this case out of the "heartland" of fraud cases. The Commission has explicitly encouraged departures based on this factor. Application Note 10 to U.S.S.G. S 2F.1.1 provides a nonexclusive list of circumstances in which the

30

loss calculated pursuant to Section 2F1.1 "does not fully capture the harmfulness and seriousness of the conduct." Application Note 10 to U.S.S.G. S 2F1.1 (1997). Causing a loss of confidence in an important institution is identified as one such circumstance. See Application Note 10(e).

Because the Guidelines suggest that a finding of loss of confidence in an important institution is sufficient by itself to place a case outside the "heartland" of typical fraud cases, we limit our examination to whether the Court properly considered the evidence put forth by the government and whether this evidence was sufficient to support a finding of loss of confidence in an important institution.10

At sentencing, the government argued that the defendants' scheme had caused a loss of confidence in both the insurance industry and the stock market. In support of its arguments, the government submitted a series of letters from policyholders of World Life and a letter from William McLucas, the Director of Enforcement at the SEC. Although it granted the departure, the Court did not state whether it based the departure on a finding of loss of confidence in the insurance industry, the stock market, or both.

Yeaman relies on this Court's holding in United States v. Neadle, 72 F.3d 1104 (3d Cir. 1996) to support his argument that the District Court departure has inadequate record support. In Neadle, the defendant, as we have noted, had been convicted of mail fraud in connection with the formation and maintenance of an insurance company. The

_____

10. In Yeaman's reply brief, he asserted for the first time that Section 2F.1.1(b)(6) of the Guidelines already takes loss of confidence into account, at least when the important institution at issue is a financial institution. As a result, Yeaman contends that the Court cannot grant an upward departure based on Application Note 10(e) unless the instant offense involved exceptional aggravating circumstances. While Yeaman has waived this argument by failing to raise it sooner, we nonetheless note that it has no merit in this particular case where the financial institution at issue for purposes of Section 2F1.1(b)(6), World Life, is an
institution separate and distinct from the "important institution" supporting the Court's decision to upwardly depart pursuant to Section 5K2.0. See discussion infra.

district court imposed a one point upward departure on the ground that " `[t]he offense itself contributed materially to the destruction of the reputation of the insurance industry in the territory." Id. at 1112 (quoting district court). This Court held that this upward departure was improper. We explained: "[T]he court based the upward departure not on sworn testimony but on unsupported judicial conclusion. Such judicial speculation cannot provide the basis for an upward departure." Id. We emphasized that the government, when asked for its evidence supporting the argument for a departure, had merely cited conversations with fifteen insureds of the fraudulent company"who did not hold the insurance industry in very high regard, meetings with people on the street, and evidence from reading newspapers." Id. at 1112 n.8 (internal quotation omitted).

Relying on the language in Neadle, Yeaman contends that the upward departure for loss of confidence in an institution in this case was similarly based on unsupported judicial conclusions rather than competent evidence. First, he notes that none of the materials submitted by the government in support of the upward departure consisted of sworn testimony. Second, he argues that the letters from policy holders tendered by the government demonstrate nothing more than their frustration occasioned by World Life's failure, i.e. their lack of coverage and resulting out-of-pocket expenses or inability to receive health care services. Finally, he observes that the SEC letter speaks generally about the deleterious effects of fraud on the securities market, but does not claim that Yeaman's conduct actually contributed to a loss of public confidence in the market.

We do not understand Neadle to hold that unsworn, but reliable and probative evidence cannot be relied upon by a sentencing court to support a departure. The law is clearly to the contrary. Rather "[i]n resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. S 6A1.3; United States v. Brothers, 75 F.3d 845, 848 (3d Cir. 1996).

With respect to the letters from World Life's insured, we find ourselves in agreement with Yeaman. As he points out, these letters demonstrate the policyholders' frustration in the past with World Life, their inability to receive benefits from World Life after having paid their premiums, and the resulting financial strain as medical problems arose. None of these letters suggest that World Life's insureds will be unlikely to purchase medical insurance in the future.

Nonetheless, the government's evidence is sufficient to support a finding of loss of confidence in the stock market. The McLucas letter provides an expert opinion that manipulation of the market through means like those employed by Yeaman destroy confidence in the securities market and that a fraudulent scheme with respect to a few stocks can have a pervasive, detrimental effect. As Director McLucas explained:

> [W]hen the integrity of the secondary market is undermined by a manipulation scheme involving even only a few stocks, there inevitably is a more persuasive effect on the securities markets as a whole. When investors lose confidence in the securities markets as a result of market manipulation of a particular stock market integrity as a whole is diminished. When that happens, investment in securities of other issurers is impeded.

(A. 495).

We find that the McLucas letter along with the other evidence concerning Yeaman's conduct provides a satisfactory predicate for the District Court's upward departure. It is not necessary in a situation of this kind that the government produce someone whose confidence in the institution has diminished as a result of the defendants' conduct. We think it clear that a sentencing court may infer that the requisite loss of confidence has occurred based on the evidence concerning the character of the fraud, and expert opinion testimony like that of Director McLucas regarding the impact of that kind of fraud on the particular institution involved. Moreover, where the Court can draw the inference that some loss of confidence in the institution occurred, that will suffice; it is not necessary that the loss

33

from this particular scheme be further quantified. See United States v. Rowe, 999 F.2d 14 (lst Cir. 1993)(permitting inference of loss of confidence in the health insurance industry based solely on the character of the defendant's fraudulent scheme).

On remand, the District Court should reevaluate its decision to impose a one level upward departure in light of our observations concerning the letters of World Life's insured. If it infers that some loss of confidence in the stock market has occurred, it may reimpose its original departure.

D. Failure to Apply Two Level Enhancement Unde r Section 3B1.3

Section 3B1.3 provides:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic.

Application Note 2 states:

> "Special skill" refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts.

The government contends that the District Court erred in refusing to impose an enhancement on Yeaman based on his specialized knowledge of the stock market as a prior stock broker and his particular knowledge acquired over decades of experience in the over-the-counter (bulletin board) market, the inner workings of a brokeragefirm, and use of a transfer agent. While the Guideline itself precludes the adjustment if the abuse of skill is included in the base offense level or specific offense characteristic, the District Court declined to impose the enhancement because "the basis for the proposed enhancement, constitutes part of the elements of the offense for which he has been convicted."

34

(A.710 (emphasis added)). The District Court, believed that an enhancement for use of special skills would amount to "double counting."

We hold that the District Court misconstrued the applicable law when it looked to whether the special skill used was part of the statutory offense, rather than included in the Guideline applicable to that offense.11 The relevant Guideline here, which applies to all fraud cases, neither makes reference to a special skill or directs that Section 3B1.3 not be applied. It follows that Section 3B1.3 must be applied if its factual predicates are satisfied. Accordingly, we will remand for initial findings as to whether Yeaman possessed special skills within the meaning of Section 3B1.1 and, if so, whether he used these skills to significantly facilitate the commission of the offense.12 While Application Note 2 does not specifically recognize stock brokers as persons possessing special skills in its list of examples, enhancements based on a defendant's special skills he or she developed as a broker or financier and used in the commission of securities fraud are proper in some circumstances. Cf. United States v. Connell, 960 F.2d 191 (1st Cir. 1992) (holding that stockbroker's ability to launder large amount of stock while shielding the true owner's identity in a way that a lay person could not do without attracting scrutiny supported use of special skill

_____

11. Yeaman notes that the government agreed, at the sentencing hearing, that the issue "was whether or not the special skill used his is so part and parcel of the overall offense as to constitute an element." (A.716) Nonetheless, we do not find that the government has waived the right to assert the correct state of the law. The government's argument appears to be due to mere inadvertence rather than a calculated attempt to mislead the District Court. In fact, the government stated the law correctly in its sentencing memorandum. See In re Chambers Development Co., 148 F.3d 214, 229 (3d Cir. 1998) ("Asserting inconsistent positions does not trigger the doctrine of judicial estoppel unless intentional self-contradiction is used as a means of obtaining unfair advantage.").

12. The government contends that the District Court made this required factual finding. The government cites the Court's statement that "this program . . . was not devised by Mr. Miller, but by those who were expert in the field of manipulating the stock." (A. 718-19) We do not find this statement to be sufficiently explicit on this point.

35

enhancement of sentence for violation of federal currency reporting requirements).

V.

Based on the foregoing analysis, we will affirm Yeaman's conviction on all counts and the District Court's imposition of a one-point upward departure based on loss of confidence in an important institution. We will remand for application of U.S.S.G. SS 2F1.1, 2F1.1(b)(6), and 3B1.3.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

36